

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**



OCT 28 2008

~~UNDER SEAL~~



MICH... ...... Clerk
By: _____ Dep. Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* RONALD J. STRECK, and THE STATE OF CALIFORNIA, THE STATE OF DELAWARE, THE STATE OF FLORIDA, THE STATE OF HAWAII, THE STATE OF ILLINOIS, THE STATE OF INDIANA, THE STATE OF LOUISIANA, THE STATE OF MASSACHUSETTS, THE STATE OF MICHIGAN, THE STATE OF MONTANA, THE STATE OF NEVADA, THE STATE OF NEW HAMPSHIRE, THE STATE OF NEW MEXICO, THE STATE OF TENNESSEE, THE STATE OF TEXAS, THE STATE OF VIRGINIA, AND THE DISTRICT OF COLUMBIA, *ex rel.* RONALD J. STRECK<br><br>Plaintiffs,<br><br>v.<br><br>ALLERGAN, INC., AMGEN, INC., ASTELLAS PHARMA US, INC., ASTRAZENECA PLC, BIOGEN IDEC, INC., BOEHRINGER INGELHEIM, GMBH, BRADLEY PHARMACEUTICALS, INC., BRISTOL-MEYERS SQUIBB COMPANY, CELGENE CORPORATION, CEPHALON, INC., COLLAGENEX PHARMACEUTICALS, INC., EISAI, INC., ELI LILLY & COMPANY, GENZYME CORPORATION, JOM PHARMACEUTICAL SERVICES, INC., MALLINCKRODT/COVIDIEN LTD., MERCK & CO., INC., NOVO NORDISK, A/S, PURDUE PHARMA, LLP, RELIANT PHARMACEUTICALS, INC., DAIICHI SANKYO, INC., SANTARUS, INC., SCHWARZ PHARMA, AG, SCIELE PHARMA, INC., SEPRACOR, INC., SHIRE, PLC, STONEBRIDGE PHARMA LLC, | CIVIL ACTION NO. 08-5135<br><br>COMPLAINT FOR VIOLATION OF FEDERAL FALSE CLAIMS ACT [31 U.S.C. §3729 *et seq.*]; CALIFORNIA FALSE CLAIMS ACT [Cal. Govt Code §12650 *et seq.*]; DELAWARE FALSE CLAIMS AND FALSE REPORTING ACT [6 Del. C. §1201]; FLORIDA FALSE CLAIMS ACT [Fla. Stat. Ann. §68.081 *et seq.*]; HAWAII FALSE CLAIMS ACT [Haw. Rev. Stat. §661-21 *et seq.*]; ILLINOIS WHISTLEBLOWER REWARD AND PROTECTION ACT [740 Ill. Comp. Stat. §175 *et seq.*]; INDIANA FALSE CLAIMS AND WHISTLEBLOWER PROTECTION ACT [IC 5-11-55]; LOUISIANA MEDICAL ASSISTANCE PROGRAMS INTEGRITY LAW [La. Rev. Stat. §437 *et seq.*]; MASSACHUSETTS FALSE CLAIMS LAW [Mass. Gen Laws ch.12 §5 *et seq.*]; MICHIGAN MEDICAID FALSE CLAIMS ACT [MI Public Act 337]; MONTANA FALSE CLAIMS ACT [Mont. Stat. Ann. 17-8-401 *et seq.*]; NEVADA FALSE CLAIMS ACT [Nev. Rev.Stat. Ann. §357.010 *et seq.*]; NEW HAMPSHIRE FALSE CLAIMS ACT [N.H. Rev. Stat. Ann. §167:61 *et seq.*]; NEW MEXICO MEDICAID FALSE CLAIMS ACT [N.M. Stat. Ann. §27-2F-1 *et seq.*]; TENNESSEE FALSE CLAIMS ACT AND TENNESSEE MEDICAID FALSE CLAIMS ACT [Tenn. Code Ann. §§4-18-101 *et seq.* and 71-5-181 *et seq.*]; TEXAS MEDICAID FRAUD PREVENTION LAW [Tex. Hum. Res. Code Ann §36.001 *et seq.*]; VIRGINIA FRAUD AGAINST TAXPAYERS |

| | |
|---|---|
| TAKEDA PHARMACEUTICALS NORTH AMERICA, INC., UPSHER-SMITH LABORATORIES, INC., and WATSON PHARMACEUTICALS, INC. | ACT [Va. Code Ann §8.01-216.1 *et seq.*]; and DISTRICT OF COLUMBIA PROCUREMENT REFORM AMENDMENT ACT [D.C. Code Ann. §2-308.14 *et seq.*] |
| Defendants. | **JURY TRIAL DEMANDED** |

1.      This Complaint, brought under the Federal False Claims Act ("FCA"), is filed **UNDER SEAL**, pursuant to 31 U.S.C. §§3729, et seq.   Plaintiff-Relator Ronald J. Streck ("Relator"), through his attorneys Faruqi &Faruqi, LLP,  on behalf of the United States of America, the State of California, the State of Delaware, the State of Florida, the State of Hawaii, the State of Illinois, the State of Indiana, the State of Louisiana, the State of Massachusetts, the State of Michigan, the State of Montana, the State of Nevada, the State of New Hampshire, the State of New Mexico, the State of Tennessee, the State of Texas, the State of Virginia, and the District of Columbia (collectively "the States"), for this Complaint against defendants Allergan, Inc., Amgen, Inc., Astellas Pharma Us, Inc., Astrazeneca Plc, Biogen Idec, Inc., Boehringer Ingelheim, Gmbh, Bradley Pharmaceuticals, Inc.,  Bristol-Meyers Squibb Company, Celgene Corporation, Cephalon, Inc., Collagenex Pharmaceuticals, Inc., Eisai, Inc., Eli Lilly & Company, Genzyme Corporation, Jom Pharmaceuticals, Inc., Mallinckrodt/Covidien Ltd., Merck & Co., Inc., Novo Nordisk, A/S, Purdue Pharma, Llp, Reliant Pharmaceuticals, Inc., Daiichi Sankyo, Inc., Santarus, Inc., Schwarz Pharma, Ag, Sciele Pharma, Inc., Sepracor, Inc., Shire, Plc, Stonebridge Pharma Llc, Takeda Pharmaceuticals North America, Inc., Upsher-Smith Laboratories, Inc., Watson Pharmaceuticals, Inc. alleges based upon personal knowledge, relevant documents, and information and belief, as follows:

## NATURE OF THE ACTION

2.      This is an action under the Federal False Claims Act ("FCA"), 31, U.S.C. §3729, *et seq.*, and the false claims acts of several states, alleging omissions and misrepresentations in

pharmaceutical manufacturers' calculating and reporting of critical sales and pricing data related to the Medicaid Program reimbursement rates and rebate amounts. Plaintiff Relator, on behalf of the United States and several of the States, seeks to recover damages and civil penalties arising from false and/or fraudulent statements, records, and claims made and caused to be made by Cephalon, Inc. and other manufacturers of pharmaceuticals and/or their agents, employees and co-conspirators.

3.      As the cost of prescription drugs has skyrocketed over the past decades, far outpacing other health care costs Congress has enacted several statutes, designed to control the prescription drug costs of government-funded health care programs, including Medicaid. The statutes impose drug pricing formulae that assist Medicaid in limiting the price the government will pay for covered drugs.

4.      The statutory schemes mandate that pharmaceutical manufacturers maintain and report accurate sales and pricing information such as their "average manufacturer price," "best price," "wholesale acquisition cost" and "average wholesale price," as each of these terms is defined in the statute or implemented by the Center for Medicare and Medicaid Services ("CMS"). Armed with accurate sales and pricing data, CMS applies the pricing formulae to determine appropriate reimbursement rates to retail pharmacies.

5.      In addition, pharmaceutical manufacturers whose products are sold to Medicaid beneficiaries must execute a rebate agreement, agreeing to pay rebates to Medicaid for the difference between the reimbursement amounts and, in general, the best price manufacturers receive from their largest customers. Given that the reimbursement and rebate formulae depend entirely on sales and pricing data that the pharmaceutical manufacturers self-report, the honesty, completeness and accuracy of the sales and pricing data they report is critical to fair reimbursement rates and rebates.

6.      Manufacturers such as Defendants, however, developed a means of manipulating pricing data that has caused Medicaid to receive materially inadequate rebates and to reimburse

retail pharmacies at materially inflated rates.  Since 2003, the three largest wholesalers and the manufacturers have executed distribution services agreements ("DSA") containing a new trade policy structure known as fee-for-service ("FFS") arrangements.  DSAs also contain price appreciation clauses.  In essence, the FFS clause entitles wholesalers to a payment equal to a set percentage of sales of the manufacturers' products, paid quarterly, purportedly for services the wholesalers provide.  The price appreciation clause, however, allows manufacturers to offset the FFS where a wholesaler has inventory-on-hand and on order – purchased at a lower price – that it can sell for a higher price and increased profit when the manufacturer implements a price increase.

7.     Indeed, for each quarter Defendants reduced the service fees they owed to distributors  by a factor relating to the amount of inventory appreciation that distributors realized at the time of a price increase:

     (a)     Defendants captured the Service Fee within the AMP calculations and showed a lower AMP.  While the Service Fee enabled Defendants to show a lower AMP, the service fees were reduced by the inventory appreciation amount before it was applied to the AMP calculation.

     (b)     Further, Defendants received credit for distributors' inventory appreciation but did not capture those credits in the AMP calculation.  As a result, Defendants paid materially inadequate rebates to Medicaid.  The distributors' inventory appreciation, if captured by Defendants, became retroactive price increases which Defendants were required to apply to their calculation of AMP as additional unit rebate amount dollar for dollar over the cumulative CPI-U for the product.

     (c)     Still further, Defendants did not reflect the service fee as a reduction in reporting their wholesale acquisition cost or the average wholesale prices.  Medicaid, therefore, over-reimbursed retail pharmacies as a direct result of

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

the purposeful or reckless reporting violations of Defendants. Indeed Defendants treated the service fees as bona fide fees for service for purposes of reporting WAC or AWP even while it is not being offered at a fair market value associated with the efficient distribution of drugs.

8.　By executing these DSAs, Defendants were able purposefully to manipulate their reported average market price as fully described below. In turn, the rebate amounts they paid were materially insufficient based on their true sales and pricing data. In addition, the FFS agreements constituted discounts even though Defendants recognized them as legitimate fees. By failing to recognize the FFS payments as discounts, the manufacturers manipulated their average wholesale prices. In turn, the rate at which Medicaid reimbursed retail pharmacies for outpatient pharmaceuticals was materially and artificially inflated.

9.　During the period covered by this Complaint, Defendants abused their reporting obligations by knowingly providing false, fraudulent and misleading price and sales data in required submissions to government health care programs. Plaintiff Relator seeks to recover all available damages, civil penalties, and other relief for state and federal violations alleged herein, in every jurisdiction to which defendant's misconduct has extended.

10.　While the precise amount of the loss to the federal and state governments cannot presently be determined, it is estimated that the damages and civil penalties that may be assessed against defendant Cephalon, alone, under the facts alleged in this Complaint amount to one hundred and fifty million dollars. It is estimated that the damages and civil penalties that may be assessed against all the Doe Defendants under the facts alleged in this Complaint amount to over two and a half billion dollars.

## JURISDICTION AND VENUE

11.　This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331, 28 U.S.C. §1367, and 31 U.S.C. §3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§3729 and 3730. In

5

addition, 31 U.S.C. §3732(b) specifically confers jurisdiction on this Court over the state law claims asserted in Counts 4-20 of this Complaint. Under 31 U.S.C. 3730(e), and under the comparable provisions of the state statutes listed in paragraph 17 above, there has been no statutorily relevant public disclosure of the "allegations or transactions" in this Complaint. Relator is the original source of the facts and information alleged in this Complaint.

12.     This Court has personal jurisdiction over the defendants pursuant to 31 U.S.C. §3732(a) because that section authorizes nationwide service of process and because the defendants have minimum contacts with the United States. Moreover, the defendants can be found in this District and transact business in this District.

13.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1395(a) and 31 U.S.C. § 3732(a) because the defendants can be found in and transact business in this District. At all times relevant to this Complaint, defendants regularly conducted substantial business within this District, maintained employees in this District, and/or made significant sales within this District. In addition, statutory violations, as alleged herein, occurred in this District.

## PARTIES

14.     Plaintiff/Relator Ronald J. Streck ("Relator"), a lawyers and pharmacist, is a resident of Reston, Virginia. He has worked for years in the pharmaceutical industry in sales, regulatory affairs and association management. Relator served as president and chief executive officer of the Healthcare Distribution Management Association for 11 years. The Healthcare Distribution Management Association has as its active members all of the primary wholesalers and as associate members a majority of the top fifty pharmaceutical manufacturers in the country.

15.     Through his work at Rx Distribution Network, Plaintiff Relator discovered that Cephalon's pharmaceutical price and sales records contain false, fraudulent, and misleading data, and that Cephalon misreported price and sales data to government programs, including Medicaid. As President and CEO of Rx Distribution Network, Plaintiff Relator became thoroughly familiar

6

with substantially similar distribution agreements that manufacturers, including Cephalon and the Doe Defendants, execute with wholesalers – agreements that enable defendants to report or indirectly allow the reporting of materially inaccurate sales and pricing data to the relevant price data compilation services.

16.     Defendant Allergan, Inc. ("Allergan") is a Delaware corporation, headquartered at 2525 Dupont Drive, Irvine California  92612  Allergan describes itself as a multi-specialty health care company focused on developing and commercializing innovative pharmaceuticals, biologics and medical devices that enable people to see more clearly, move more freely and express themselves more fully. Allergan touts its diversified approach, enabling it to follow its research and development into new specialty areas where unmet needs are significant.

17.     Defendant Amgen, Inc. ("Amgen") is a Delaware corporation, headquartered at One Amgen Center Drive, Thousand Oaks, CA  91320-1799.  Amgen describes itself as a global biotechnology company that discovers, develops, manufactures and markets human therapeutics based on advances in cellular and molecular biology, operating in one business segment — human therapeutics.

18.     Defendant Astellas Pharma US, Inc. ("Astellas") is the United States affiliate of Tokyo-based Astellas Pharma, Inc., headquartered at Three Parkway North, Deerfield, IL 60015-2537.  Astellas describes itself as a pharmaceutical company dedicated to improving the health of people around the world through the provision of innovative and reliable pharmaceutical products.  It touts its commitment to becoming a global pharmaceutical company by combining outstanding R&D and marketing capabilities and continuing to grow in the world pharmaceutical market.

19.     Defendant AstraZeneca PLC ("AstraZeneca") is and English corporation, headquartered at 15 Stanhope Gate, London W1K 1LN. AstraZeneca describes itself as a major international healthcare business engaged in research, development, manufacturing and marketing of prescription pharmaceuticals and supplier for healthcare services. AstraZeneca

touts itself as one of the world's leading pharmaceutical companies with healthcare sales of $29.55 billion and as a leader in gastrointestinal, cardiovascular, neuroscience, respiratory, oncology and infection product sales.

20.    Defendant Bayer HealthCare Pharmaceuticals ("Bayer Healthcare") was created in 2006 when Berlex Inc.'s German affiliate was acquired by Bayer AG. Headquartered at 340 Changebridge Road, PO Box 1000, Montville, NJ 07045-1000, Bayer Healthcare touts itself as the seventh largest specialty pharmaceutical company worldwide with more than $11.7 billion in annual revenues. The combined company's core strengths in specialty pharmaceuticals include Women's Healthcare, Diagnostic Imaging, Specialized Therapeutics, Hematology/Cardiology, Primary Care, and Oncology.

21.    Defendant Biogen Idec, Inc. ("Biogen") is a Delaware corporation, headquartered at 14 Cambridge Center, Cambridge MA 02142. Biogen boasts that it creates new standards of care in therapeutic areas with high unmet medical needs. It describes itself as a global leader in the development, manufacturing, and commercialization of innovative therapies. Biogen sells its products in more than 90 countries to address diseases such as multiple sclerosis, lymphoma and rheumatoid arthritis.

22.    Defendant Boehringer Ingelheim, GmbH ("Boehringer") is a German Corporation, headquartered at Binger Str. 173 55216 Ingelheim, Germany. Boehringer describes itself as one of the world's 20 leading pharmaceutical companies. It boasts operations globally with 135 affiliates in 47 countries and 39,800 employees. Since it was founded in 1885, Boehringer touts its commitment to researching, developing, manufacturing and marketing novel products of high therapeutic value for human and veterinary medicine.

23.    Defendant Bradley Pharmaceuticals, Inc. ("Bradley") is a Delaware corporation, headquartered at 383 Route 46 West, Fairfield, NJ 07004. It is a wholly owned subsidiary of Nycomed US, Inc.. Bradley describes itself as a specialty pharmaceutical company that

acquires, develops and markets prescription and over-the-counter products in niche therapeutic markets, including dermatology, podiatry, gastroenterology and women's health.

24.     Defendant Bristol-Meyers Squibb Company ("Bristol-Meyers") is a Delaware corporation, headquartered at 345 Park Avenue, New York, NY 10154. Bristol-Meyers claims to operate in three reportable segments, including the research, development, manufacturing and marketing of pharmaceutical products.

25.     Defendant Celgene Corporation ("Celgene") is a Delaware corporation, headquartered at 86 Morris Avenue, Summit, NJ 07901. Celgene describes itself as a global integrated biopharmaceutical company primarily engaged in the discovery, development and commercialization of innovative therapies designed to treat cancer and immune-inflammatory related diseases.

26.     Defendant Cephalon, Inc. ("Cephalon") is a company incorporated under the laws of Delaware, with its principal place of business at 41 Moores Road, Frazer, Pennsylvania, 19355. Cephalon develops, manufactures and markets pharmaceutical products in the United States.

27.     Defendant CollaGenex Pharmaceuticals, Inc. ("CollaGenex") is a Delaware corporation, headquartered at 41 University Drive, Newtown, PA 18940. CollaGenex describes itself as a specialty pharmaceutical company currently focused on developing and marketing innovative proprietary medical therapies to the dermatology market.

28.     Defendant Eisai, Inc. ("Eisai") is the wholly owned U.S. subsidiary of Eisai, Ltd., a Japanese corporation. Eisai is headquartered in 100 Tice Boulevard, Woodcliff Lake, New Jersey 07677 and describes itself as a research-based human health care company that discovers, develops and markets pharmaceutical products throughout the world.

29.     Defendant Eli Lilly & Company ("Eli Lilly") is an Indiana corporation, headquartered at Lilly Corporate Center, Indianapolis, IN 46285. Eli Lilly is a pharmaceutical company that discovers, develops, manufactures, and sells pharmaceutical products.

30.     Defendant Genzyme Corporation ("Genzyme") is a Massachusetts corporation, headquartered at 500 Kendall Street, Cambridge, MA  02142.  Genzyme describes itself as a global biotechnology company dedicated to making a major impact on the lives of people with serious diseases. Our broad product and service portfolio is focused on rare disorders, renal diseases, orthopaedics, organ transplant, diagnostic and predictive testing, and cancer.

31.     Defendant JOM Pharmaceutical Services, Inc.  ("JOM")

32.     Defendant Mallinckrodt/Covidien Ltd. ("Mallinckrodt") is a Bermuda company, headquartered at 131 Front Street, Hamilton HM 12 Bermuda.  Mallinckrodt describes itself as a global leader in the development, manufacture and sale of healthcare products for use in clinical and home settings.  According to Mallinckrodt, its products are found in almost every hospital in the United States, and it has a significant and growing presence in non-U.S. markets.  Its mission is to create and deliver innovative healthcare solutions, developed in collaboration with medical professionals, which enhance the quality of life for patients and improve outcomes for our customers and our shareholders.

33.     Defendant Merck  &  Co.,  Inc.  ("Merck")  is  a  New  Jersey  corporation, headquartered at One Merck Drive, Whitehouse Station, NJ 08889.  Merck describes itself as a global research-driven pharmaceutical company that discovers, develops, manufactures and markets a broad range of innovative products to improve human and animal health. Its operations are principally managed on a products basis and are comprised of two reportable segments: the Pharmaceutical segment and the Vaccines segment.

34.     Defendant Novo Nordisk, A/S ("Nov Nordisk") is a corporation of the Kingdom of Denmark, headquartered at Novo Alle 1, DK-2880, Bagsvaerd, Denmark.  Novo Nordisk describes itself as a healthcare company and a world leader in diabetes care.  In addition, Novo Nordisk touts its leading position within areas such as haemostasis management, growth hormone therapy and hormone replacement therapy.  Novo Nordisk manufactures and markets

pharmaceutical products and services that make a significant difference to patients, the medical profession and society.

35.    Defendant Purdue Pharma, LLP ("Purdue") is a privately held pharmaceutical company, headquartered at One Stamford Forum, 201 Tresser Boulevard, Stamford, CT 06901-3431. According to Purdue it is focused on meeting the needs of healthcare providers and the patients in their care. Purdue boasts that it, together with its affiliates and associated companies, is dedicated to finding, developing, and bringing to market new medicines and related products that improve health outcomes. Purdue touts that it is known for its pioneering research on persistent pain, a principal cause of human suffering.

36.    Defendant Reliant Pharmaceuticals, Inc. ("Reliant"), a wholly owned subsidiary of Glaxo SmithKline, Plc, is a Delaware corporation, headquartered at 110 Allen Road, Liberty Corner, NJ 07938. Reliant describes itself as a rapidly growing pharmaceutical company that specializes in the development, commercialization and marketing of prescription therapeutic products, including four cardiovascular products in the United States, including our lead product Lovaza.

37.    Defendant Daiichi Sankyo, Inc. ("Daiichi"), headquartered in Two Hilton Court Parsippany, NJ 07054, is a wholly owned subsidiary of Daiichi Sankyo Ltd. of Japan.

38.    Defendant Santarus, Inc. ("Santarus") is a Delaware corporation, headquartered at 10590 West Ocean Air Drive, Suite 200, San Diego, CA 92130. Santarus describes itself as a specialty pharmaceutical company focused on acquiring, developing and commercializing proprietary products that address the needs of patients treated by gastroenterologists or primary care physicians.

39.    Defendant Schwarz Pharma, AG ("Schwarz") is a wholly owned subsidiary of UCB-Group of Belgium, headquartered in Monheim Germany. Schwarz describes itself as a leading global biopharmaceutical company dedicated to the research, development and commercialization of innovative pharmaceutical and biotechnology products in the fields of

central nervous system disorders, allergy/respiratory diseases, immune and inflammatory disorders and oncology. UCB focuses on securing a leading position in severe disease categories.

40.    Defendant Sciele Pharma, Inc. ("Sciele") is a Delaware corporation, headquartered at 5 Concourse Parkway, Suite 1800, Atlanta, GA 30328. Sciele describes itself as a pharmaceutical company, specializing in sales, marketing and development of branded prescription products focused on Cardiovascular, Diabetes, Women's Health, and Pediatric treatment.

41.    Defendant Sepracor, Inc. ("Sepracor") is a Delaware corporation, headquartered at 84 Waterford Drive, Marlborough, MA 07152. Sepracor describes itself as a research-based pharmaceutical company focused on discovering, developing and commercializing differentiated products that address large and growing markets and unmet medical needs and that are prescribed principally by primary care physicians and certain specialists.

42.    Defendant Shire, Plc ("Shire") is a public limited company, incorporated under the laws of England and Wales and headquartered at Hampshire International Business Park, Chineham, Basingstoke, Hampshire, England, RG24 8EP. Shire describes itself as a leading specialty biopharmaceutical company that focuses on meeting the needs of the specialist physician.

43.    Defendant Stonebridge Pharma LLC ("Stonebridge"), a wholly owned subsidiary of Stiefel Laboratories, Inc., is a limited liability company, headquartered at 6340 Sugarloaf Parkway, Duluth, GA 30097.

44.    Defendant Takeda Pharmaceuticals North America, Inc. ("Takeda"), formerly known as TAP Pharmaceutical Products, Inc. in is a wholly owned subsidiary of Takeda Pharmaceutical Company Ltd. of Japan, headquartered at One Takeda Parkway, Deerfield, IL 60015. Takeda claims to focus on a variety of therapeutic areas including bone and joint disorders, cardiovascular disease, central nervous system disorders, chronic kidney disease, diabetes, gastroenterology, gynecological disorders and infectious disease.

45.     Defendant Upsher-Smith Laboratories, Inc. ("Upsher-Smith"), is a Minnesota corporation, headquartered at 6701 Evenstad Drive, Maple Grove, MN 55369.  Upsher-Smith describes itself as actively pursuing product development opportunities in the therapeutic areas of epilepsy and Parkinson's disease.

46.     Defendant Watson Pharmaceuticals, Inc. ("Watson") is a Nevada corporation, headquartered at 311 Bonnie Circle, Carona CA 92880-2882.  Watson describes itself as a leading specialty pharmaceutical company engaged in the development, manufacture, marketing, sale and distribution of brand and generic (off-patent) pharmaceutical products.

## SUBSTANTIVE ALLEGATIONS

### Background

47.     For purposes of the allegations herein, there are several important characteristics relating to the flow of goods in the market for prescription drugs.  First, the drug industry is extremely competitive.  Competition exists within drug categories between patented brand name drugs manufactured by competing drug companies, as well as between brand name drugs and their generic counterparts.  Manufacturers fiercely compete with one another for market share. This climate of competition allows institutional or large volume customers to demand lower prices from manufacturers lest the customer transfer its business to a competing manufacturer with a therapeutically equivalent drug.  Thus, manufacturers routinely and aggressively discount their products to large customers – discounts federal law mandates they must pass on to Medicaid.

48.     Second, wholesalers play a central role in the sales and distribution of pharmaceuticals.  Defendants sell a majority of their pharmaceuticals through "primary wholesalers" that stock various manufacturers' drugs and resell the drugs directly to retail pharmacies.  As a result, wholesaler sales and pricing data are critical to the pharmaceutical manufacturers' reporting their sales and pricing information to various government programs,

13

including Medicaid.  Indeed, given the overwhelming volume of outpatient pharmaceuticals the manufacturers sell to and through wholesalers, any material distortion of sales and pricing data to wholesalers will likely directly cause government programs like Medicaid drug program to overpay for outpatient pharmaceuticals.

### Distribution Services Agreements

49.     In the 1980s and 1990s wholesalers engaged in speculative buying of pharmaceuticals from manufacturers based on predicted future price increases.  In anticipation of price increases, wholesalers increased their stock of a particular drug at the lower, then-current price.  When the price increased, the wholesalers had stock on hand that they had purchased at a lower price.  This alleviated their need immediately to purchase pharmaceuticals at the increased price.  They were, however, able to include the price increase as they sold the drugs down the distribution chain.  Not only were the manufacturers losing profits from this practice, but it caused them significant operational problems.

50.     To end the practice of speculative buying, manufacturers instituted "inventory management agreements" with wholesalers.   In exchange for agreeing to the inventory management agreements, when drug prices were raised, wholesalers were given the opportunity to purchase drugs at the previous lower price for a term of one to four months ("buy-ins") or, wholesalers received price increase credits from manufacturers for one to four months.

51.     The inventory management agreements and the buy-ins or credits, however, were not as profitable for wholesalers.  In response, starting as early as 2003, the wholesalers sought to create a new trade policy structure known as fee-for-service ("FFS") clauses in new distribution services agreements ("DSA").  Gone was the focus on resale profit margin in favor of fee-for-service ("FFS") clauses that obligated manufacturers periodically to pay a set fee, often stated as a percentage of sales of the manufacturers' products.

14

52.     FFS clauses allowed wholesalers to extract discounts from manufacturers that protected part of the profits they once derived from speculative buying.   DSAs, however, prevented further windfall profits by establishing certain inventory control procedures and by allowing the manufacturers to "claw-back" profits for drugs that wholesalers maintained in their inventory after the manufacturers raised prices.   These price appreciation clauses ("PAC" or "appreciation clause") enabled the manufacturers to share in any windfall profit that the wholesalers were making by having inventory purchased prior to a price increase on hand and available for sale after a price increase.   The manufacturers also tied appreciation clauses directly to the FFS clause, mandating that any profits wholesalers earned through less costly inventory would offset the FFS payment.

53.     In general, Cephalon's DSA with wholesalers is a prototype for industry-wide FFS clauses incorporated in DSAs.   For example, the purpose for Cephalon's DSA is to establish a "Wholesaler Discount Program" intended to "provide a discount to the Wholesaler for a Contract Year in recognition of its handling all distribution and related support service functions to all retail, institutional and specialty customers purchasing CEPHALON Products." Purportedly in exchange for these services – most of the services the wholesalers had performed for Cephalon for free prior to executing the DSA – Cephalon discounts nearly all pharmaceutical product sales to certain wholesalers by 2% and by 1% for Cephalon Specialty/Other Products. Cephalon pays the discount quarterly as wholesaler service agreement ("WSA") credits toward future purchases of Cephalon products by that wholesaler.

54.     The DSA agreements between Defendants and wholesalers, however, contain appreciation clauses.   For example, in one particular DSA that Defendant Cephalon executed, the PAC takes the form of offsets to the WSA credits.   To calculate WSA credits, "CEPHALON will credit back to the Wholesaler an amount equal to 2.00% of the Wholesaler's Pharmaceutical Products and 1.00% of CEPHALON Specialty/ Other Products purchases during the calendar

15

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

quarter, *less any Calculated Inventory Appreciation*, and any applicable performance penalties. . . ." (Emphasis added).

55.     The DSA defines "Calculated Inventory Appreciation" as "the value of inventory appreciation benefit recognized by the Wholesaler at the time of Price Change.  This is calculated as New Price minus Old Price multiplied by actual inventory on hand plus any product on order or in transit at the Old Price at the time of the Price Change."  Thus, the manufacturer – Cephalon in this case – offsets the FFS credit with a give-back from the wholesaler.

56.     Cephalon's DSA with wholesalers is typical of substantially all of the DSAs in the industry.

### DSAs Materially and Improperly Distort Medicaid Rebates and Reimbursement Rates

57.     The Medicaid Program ("Medicaid") is a public assistance program providing payment of medical expenses for low-income and needy persons.  It covers approximately 44 million individuals, including children, the aged, blind, and/or disabled, and people who are eligible to receive federally assisted income maintenance payments.  The federal government and the various states shared the funding burden for Medicaid.  While the various states actually administer the Medicaid program, they adhere strictly to federal guidelines.

58.     Not only does the Medicaid program assist with the costs of treatment, but it also covers the costs of certain outpatient pharmaceuticals for those who qualify for its benefits. Federal statutes and regulations restrict the drugs and drug uses that Medicaid covers.  When a Medicaid beneficiary has a drug prescription filled, the Medicaid Program reimburses the retail pharmacist.

59.     For the past several decades outpatient pharmaceutical costs have been increasing dramatically.  Expenditures for outpatient prescription drugs have far outpaced other health care costs, and are the fastest growing cost of health plans funded by the state and federal

16

governments, including Medicaid. Congress responded to escalating costs by enacting several statutes designed to control the prescription drug costs of government-funded health care programs, including Medicaid. To curb mounting Medicaid drug expenditures, Congress created the Medicaid drug rebate program ("DRP") under the Omnibus Budget Reconciliation Act of 1990. The intent of the DRP was to set maximum prices that Medicaid would pay for outpatient pharmaceuticals, ensuring that the Program availed itself of the same discounts and price concessions that pharmaceutical manufacturers offer their most favored commercial customers, including, in particular, the wholesalers.

60.     Congress and regulators created certain pricing formulae that tie the price Medicaid ultimately pays to reimburse for outpatient pharmaceuticals to the best prices manufacturers offer to their largest customers. Congress accomplished this by mandating that manufacturers pay a rebate to the government for all outpatient pharmaceuticals Medicaid covers. That is, Medicaid reimburses retail pharmacies for the cost of prescriptions and then, under the terms of the DRP, seeks a rebate from the manufacturer of the drug in question that reflects a far larger volume purchase. The Centers for Medicare and Medicaid Services ("CMS")[1] determines the amount of the required rebates that manufacturers owe the Medicaid Program based on the sales and pricing data that manufacturers must collect and report as conditions of participating in the Medicaid Program.

61.     Thus, critically, the pharmaceutical pricing formulae mandated by Congress rely upon the integrity of the pharmaceutical manufacturers. In setting prices, the government relies upon – and the law requires – manufacturers to provide honest, complete, and accurate sales and pricing data upon which Medicaid can rely.

62.     Under the DRP, to receive Medicaid coverage for outpatient prescription drugs, Cephalon and other manufacturers are required to enter into a Medicaid Rebate Agreement with

---

[1] CMS is an agency of the United States Department of Health and Human Services that administers the Medicaid program on behalf of the states.

CMS.[2] The rebate amount is based upon average manufacturer price ("AMP"),[3] or the difference between the AMP and best price ("BP")[4] for each "covered outpatient drug," multiplied by the total number of units of each drug paid for by the states during the quarterly rebate period.[5]

63.     BP is "the lowest price available from the manufacturer during the rebate period to any wholesaler, retailer, provider, health maintenance organization, nonprofit entity, or governmental entity within the United States . . . ."[6]  The Best Price includes all discounts, rebates, or other price concession.[7]  The minimum rebate amount is 15.1 percent of the AMP.[8] Manufacturers are required to report their AMP and BP for each covered drug to CMS within 30 days of each quarterly rebate period.[9]

64.     The rebate payment is the last step in the Medicaid reimbursement process. Typically, beneficiaries submit prescriptions to their pharmacy.  The pharmacy submits a claim for reimbursement to the state Medicaid program.  The claim specifies the drug, its manufacturer and the strength and number of dosage dispensed.  The state Medicaid offices tie the rate of

---

[2] *See* 42 U.S.C. §1396r-8(a)(1).

[3] Average Manufacturer Price is the average price paid to the manufacturer for the drug by wholesalers for distribution to retail pharmacies, after deducting customary prompt pay discounts. § 1927(k)(1) of the Social Security Act, 42 U.S.C. §1396r-8(k)(1). The Deficit Reduction Act of 2005 revised the definition of AMP to exclude customary prompt pay discounts to wholesalers effective July 1, 2007.

[4] Best Price is the lowest price at which a manufacturer will supply a drug to any wholesaler, retailer, provider, HMO or nonprofit or governmental entity in the U.S., subject to certain exceptions. §1927(c)(1)(C) of the Social Security Act, 42 U.S.C. §1396r-8(c)(1)(C).

[5] *See* 42 U.S.C. §1396r-8(c)(1)(A).

[6] *See* 42 U.S.C. §1396r-8(c)(1)(C)(i).  Excluded from the calculation of BP are sales to certain agencies of the federal government such as the Indian Health Service, the Department of Veterans Affairs and the Department of Defense and pharmaceutical assistance programs of the various states. *Id.*

[7] *See* 42 U.S.C. §1396r- 8(c)(1)(C)(ii).

[8] *See* 42 U.S.C. §1396r-8(c)(1)(B)(i).

[9] *See* 42 U.S.C. §1396r-8(b)(3)(A)(i).

The Guidance states that one of the "areas of significant concern" to the government enforcement community is the "integrity of data used by state and federal governments to establish payment amounts" for covered drugs under Medicaid, Medicare, and other government health care programs. The Guidance explains:

> Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A pharmaceutical manufacturer may be liable under the False Claims Act if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly (as defined in the False Claims Act) failed to generate or report such information completely and accurately.

68.     The Guidance further provides:

> [M]anufacturers' reported prices should accurately take into account price reductions, rebates, up-front payments . . . or other price concessions or similar benefits offered to some or all purchasers.

> \* \* \*

> Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks . . . , manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs. ***In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.*** [Emphasis added].[15]

69.     Defendants' practices alleged in this Complaint are precisely the type of practices identified in the Guidance that violate the FCA. As described below, Cephalon reported fraudulent prices that hid discounts to wholesalers through fee for service agreements and knowingly failed to ensure the accuracy and integrity of data used in pricing and rebate calculations and reporting. As a direct result, Cephalon's pricing and rebate reporting was

---

[15] *Id.* at 23733-34.

The Guidance states that one of the "areas of significant concern" to the government enforcement community is the "integrity of data used by state and federal governments to establish payment amounts" for covered drugs under Medicaid, Medicare, and other government health care programs. The Guidance explains:

> Many federal and state health care programs establish or ultimately determine reimbursement rates for pharmaceuticals, either prospectively or retrospectively, using price and sales data directly or indirectly furnished by pharmaceutical manufacturers. The government sets reimbursement with the expectation that the data provided are complete and accurate. The knowing submission of false, fraudulent, or misleading information is actionable. A pharmaceutical manufacturer may be liable under the False Claims Act if government reimbursement (including, but not limited to, reimbursement by Medicare and Medicaid) for the manufacturer's product depends, in whole or in part, on information generated or reported by the manufacturer, directly or indirectly, and the manufacturer has knowingly (as defined in the False Claims Act) failed to generate or report such information completely and accurately.

68.    The Guidance further provides:

> [M]anufacturers' reported prices should accurately take into account price reductions, rebates, up-front payments . . . or other price concessions or similar benefits offered to some or all purchasers.

* * *

> Given the importance of the Medicaid Rebate Program, as well as other programs that rely on Medicaid Rebate Program benchmarks . . . , manufacturers should pay particular attention to ensuring that they are calculating Average Manufacturer Price and Best Price accurately and that they are paying appropriate rebate amounts for their drugs. *In sum, pharmaceutical manufacturers are responsible for ensuring the integrity of data they generate that is used for government reimbursement purposes.* [Emphasis added].[15]

69.    Defendants' practices alleged in this Complaint are precisely the type of practices identified in the Guidance that violate the FCA. As described below, Cephalon reported fraudulent prices that hid discounts to wholesalers through fee for service agreements and knowingly failed to ensure the accuracy and integrity of data used in pricing and rebate calculations and reporting. As a direct result, Cephalon's pricing and rebate reporting was

---

[15] *Id.* at 23733-34.

inaccurate and incomplete and caused (1) the federal and state governments to receive materially less in rebates than that to which they were entitled and (2) the Medicaid Program to pay more for prescription drugs than it otherwise should have paid but for Defendants' wrongful conduct.

### Defendants' Scheme to Defraud the United States and The Various States

70.     During the period covered by this Complaint, Defendants abused their reporting obligations by knowingly providing false, fraudulent and misleading price and sales data in required submissions to government health care programs.  As a result of its unlawful conduct, Defendants have (1) avoided paying rebates they owe to the United States and the States under the Medicaid rebate program and (2) inflated the price paid to Defendants directly or indirectly by the United States and the States for Defendants' pharmaceuticals covered by government health care programs.  Additionally, Defendants' failure to abide by their reporting obligations caused the United States and States to provide inflated reimbursements to retail pharmacies. Cephalon thereby obstructed and prevented the United States and the States from receiving the intended benefit of laws designed to limit their prescription drug costs under the Medicaid Program.

71.     As described above, the PAC works in tandem with the FFS.  The PAC applies when the manufacturer raises its price for a drug.  These price increases are large and frequent. At the time of a price increase, wholesalers often have product in stock and on-order that the wholesaler paid for at the lower price.  At the time of a price increase, however, the wholesalers with product in stock and on-order sells the stock at the new price and earns greater profit or the wholesaler may use the lower price at which it purchased the product to create a competitive advantage.

72.     Under the PAC, manufacturers re-capture part of the price-appreciation for the inventory the wholesaler has on-hand and on-order by crediting it against the 2% FFS it owes the wholesaler.  Manufacturers are able to do this by capturing daily purchase and sales data the

wholesaler agrees to provide in the FFS agreement. Thus, the PPC retroactively captures for the manufacturer the inventory appreciation the wholesaler accumulates from the increases in the price for pharmaceuticals even though the product has already been sold by the manufacturer and title has already passed to the wholesaler.

73.     For a fee to be determined not to be a discount, and thus to be excluded from the calculation of the AMP, the following conditions must be met: (a) the fee paid must be for a *bona fide*, itemized service that is actually performed on behalf of the manufacturer; (b) the manufacturer would otherwise perform or contract for the service in the absence of the service arrangement; (3) the fee represents fair market value; and (4) the fee is not passed on in whole or in part to a client or customer of any entity.

74.     For drugs in a wholesaler's inventory and on-order, the appreciation is credited back to the manufacturers when they announce price increases. The result of this is an increase in the actual price the wholesaler pays for products initially purchased at a lower price. On information and belief, however, Defendants do not reflect this credit in their calculation of AMP. As is the case with any rebate or other price reduction, Defendants are obligated by law to include all fees in its pricing submissions to the government. During the period covered by this Complaint, Defendants knowingly failed to include the full extent of the credits it took for FFS obligations to wholesalers in Defendants' calculation of AMP.

75.     Relator discovered that drug sales and price information maintained by Defendants, and submitted to the government, was fraught with major flaws that rendered the data false, fraudulent, and misleading.

76.     Defendants knowingly failed to correlate their payment of FFS to services associated with the efficient distribution of drugs by their primary wholesalers. Defendants failed to pay the FFS to primary wholesalers when prices increased for products already on order to the wholesalers or in the wholesalers' inventory.

22

77.    On information and belief, Defendants did not include credits it took for FFS into its calculation of AMP.  In this way, Defendants knowingly understated their AMP figures and knowingly distorted, directly or indirectly, other benchmark calculations such as AWP.  The understating of AMP unlawfully decreased Defendants' Medicaid rebate obligation and unlawfully inflated the payments it received, directly and indirectly, from Medicaid and various government health care programs.

### *Defendants' Distortion of the Reported AMP Reduces Rebates Defendants owe to the United States and the Various States*

78.    Purposeful miscalculation of AMP has allowed and allows Defendants to pay lower than required rebates to the states' Medicaid programs without the knowledge of the federal government of the governments of the various states.

79.    As noted above, manufacturers must report AMP to CMS on a quarterly basis. As manufacturers are well aware, CMS uses the AMP number to conduct Unit Rebate Amount Calculations ("URA Calculations").   The URA Calculations are a multi-step process that calculates the rebates that manufacturers like Cephalon must pay state Medicaid.   The total amount owed by a manufacturer in rebates is the Total Unit Rebate Amount ("Total URA"). Total URA is the sum of its two principal components: Basic URA and Additional URA.  Basic URA is the amount that manufacturers will rebate to Medicaid. Basic URA is the greater of (1) 15.1% of AMP or (2) the difference between AMP and Best Price.   Additional URA is the amount, if any, that manufacturers will rebate to Medicaid because of price increases above CPI-U.

80.    Defendants' scheme to avoid including credits taken on FFS after price increases permitted them to lower their AMP.  In turn, that practice prevents CMS from demanding the proper Total URA that Defendants owe in the form of Basic URA and Additional URA.

81.    Under the Medicaid Program, Medicaid has a price guarantee with drug manufacturers. The guarantee states that the government will not be subject to price increases

Case 2:08-cv-05135-ER   Document 1   Filed 10/28/08   Page 24 of 56

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

above CPl-U after drugs are entered into the Medicaid Program. The guarantee is enforced through calculation of Additional URA.  When price increases beyond CPI-U are detected through the calculation of Additional URA, manufacturers must rebate any price increase above and beyond CPI-U to the government dollar for dollar of additional price increase above and beyond CPI-U.  In general, pharmaceutical prices for branded products have risen annually an average of 2-3 times the CPI-U since the year 2000.   Therefore, nearly every price increase during the same period for Cephalon and "Does" has been beyond CPI-U and subject to the Additional URA dollar for dollar.

82.    The scheme alleged in this Action is a means by which Defendants circumvent the price guarantee by distorting the calculation of Additional URA.

83.    As described above, each time Defendants take credits against a wholesaler's inventory through the Appreciation Clause in the Agreement and fails to include it in AMP, the AMP number reported to CMS is improperly deflated.   The calculation of Additional URA begins with AMP.

84.    The calculation of Additional URA begins with CMS dividing baseline AMP by baseline CPI-U.  The resulting number is multiplied by quarterly CPI-U.  If this number is less than the quarterly AMP, it is subtracted from the quarterly AMP to determine the Additional URA.

85.    Accordingly, by reporting artificially deflated AMP to the government, Defendants pay the government smaller rebates in the form of URA and Additional URA than are required.

### Defendants Underreport AMP and Basic URA

86.    For calculations of Basic URA, an underreported AMP insures that either 15.1% of AMP is lower than it should be or the difference between AMP and Best Price is lower than it

should be. By virtue of this systematic underreporting of AMP, Cephalon pays smaller than required rebates.

87.    For example, in April 2007, Defendant Cephalon supplied CMS with its 1st quarter AMP and Best Price calculations.  Defendant Cephalon failed to report an additional calculation under AMP reflecting credit for inventory appreciation from its wholesalers as a retroactive price increase.  Defendant Cephalon sent memos to wholesalers in July 2007 crediting the inventory price appreciation against the FFS.

88.    If Defendant Cephalon took credit for the inventory appreciation from the price increase then it should have included the full two percent in its AMP calculation.   On information and belief, Defendant Cephalon failed to include the full two percent in its AMP calculation despite taking the full 2% credit against the FFS due wholesalers for the quarter.

### Defendants' Distortion of Average Wholesale Price ("AWP") Causes the Government to Overpay Retail Pharmacies

89.    When a Medicaid beneficiary fills a drug prescription, the retail pharmacy is reimbursed by Medicaid.  Medicaid, through the states, generally pays the drug's estimated acquisition cost ("EAC") plus a dispensing fee.  The EAC is the state Medicaid agency's best estimate of the price generally and currently paid by providers for the drug.  Most states use the AWP of a drug to determine EAC.  Some states also base their EAC on the WAC and add a percentage mark-up.

90.    WAC is reported for each drug sold to wholesalers by manufacturers directly or indirectly. When Cephalon reports price increases, it sends notices to its direct customers.  The direct accounts forward the new WAC to *Red Book* and other compendia.

91.    AWP represents WAC, or the actual price that manufacturers charge a wholesaler plus a predetermined mark-up.  For example, for Defendant Cephalon's drugs the mark-up is 20%.

92.    The FFS that Defendants pay wholesalers constitutes discounts. Discounts are generally not included in WAC, but Defendants do not include the FFS as a discount in their notices to their direct customers which are then forwarded to *Red Book* and other compendia that publish WAC and AWP which is derived from WAC.

93.    The FFS agreement with an "appreciation clause," however, is not *bona fide* for a number of reasons. First, the fee owed is not related to fair market value. The fee owed and paid each quarter varies depending on whether the manufacturer has price increases. Increasing the number and the extent of price increases lowers the fee that will be owed and paid for the quarter. In fact, in Defendant Cephalon's case there were many quarters when, after the inventory appreciation credit was deducted from the FFS, the wholesaler ended up owing Cephalon; Cephalon recouped what the wholesalers owed it by taking a credit against the next quarter's fee-for-service.

94.    Next, the fee negotiated was based on replacing the margins the large distributor made when speculative purchasing the manufacturer's products and is not related to the market value of services provided.

95.    Third, initially Defendants contracted for the service with only to a few high volume distributors and not with regional distributors providing the same or similar services. During that period the manufacturer did not perform or contract for the service in the absence of the service arrangement. A number of regional wholesalers who provide the same or similar services, however, do not receive fees for service from many of the Defendants, and Defendants have not performed or contracted for the service in the absence of a service arrangement with these regional distributors.

96.    Last, regional distributors have contacted manufacturers that are providing FFS agreements to only the large distributors to provide the manufacturers notice that the fee is being passed on by the large distributors in offers to customers of the regional distributors.

26

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

97.    After WAC is released, directly or indirectly by a manufacturer, it is converted to AWP and published in industry publications such as *Red Book*. State Medicaid agencies rely on published AWP to determine the amount of reimbursements paid to retail pharmacies.

98.    Here, Defendants' failure to account for the FFS discount it pays to wholesalers and direct customers inflates WAC and, therefore, AWP. Accordingly, reimbursements based on Cephalon's released WAC and AWP, are inflated. When state Medicaid programs such as Medi-Cal of California use either AWP or WAC to determine its EAC, the final EAC figure is also inflated. The overstated AWP leads directly to overpayment by state Medicaid to retail pharmacies.

99.    Compounding this problem are confidentiality clauses within DSAs. For example, Defendant Cephalon's DSA with wholesalers contains a "Confidentiality" clause, assuring that no party to the agreement discloses any of the terms of the agreement. In fact, nearly all of the agreements prohibit the parties from even admitting that there is an agreement between the parties. The terms of the agreement and the history of these agreements with Price Appreciation Clauses show a tendency to guard the secrecy of the fraud. There have been numerous conferences on FFS agreements. The issue of PACs as they relate to and affect FFS clauses, rebates and reimbursements has never been disclosed or discussed. Comments by the industry regarding the proposed CMS Rule on AMP, which discussed FFS and what constitutes a bona fide fee-for-service, never disclosed or discussed the presence of Price Appreciation Clauses.[16]

100.    While a thorough audit would be required to determine the exact amount in lost rebates and overpayments, a brief review of Defendant Cephalon's annual sales, products receiving price increases and amount of price increases serves to estimate both lost rebates and overpayments demonstrates the large losses Medicaid has potentially suffered as a result of

---

[16] *See* Federal Register, Vo. 72, No. 136 (July 17, 2007), 42 C.F.R. Part 447 [CMS-2238-FC].

Defendants' wrongful conduct.  From 2005 through projected 2008, Cephalon's Medicaid sales were $113 million, $180 million, $196 million, and $224 million constituting 12%, 14%, 14% and 14% of Cephalon's total U.S. sales respectively.  Using average annual Medicaid price increases of 20% from 2005-2008, Medicaid overpaid for Cephalon's prescription drugs by approximately $14,260,000.   In addition, by means of its fraudulent scheme, Cephalon improperly withheld rebate payments to Medicaid in the amount approximately $17,190,000. Altogether, therefore, Cephalon, itself, owes the United States $31,450,000, exclusive of penalties, interest and exemplary damages.

    101.   Calculating damages requires gathering the following information:

    (a)   Copies of Distribution Service Agreements or other agreements that the Defendants have with distributors, or chains, from January 2004 forward;

    (b)   Copies of credit memoranda and worksheets provided to distributors, or chains by Defendants at the time of quarterly or annually reconciliation of the above agreements from January 2004 forward;

    (c)   Copies of the same quarter's Medicaid submission with Defendants' AMP calculations for Medicaid from January 2004 forward; and

    (d)   Spreadsheets of price increases for the time period include the product, the effective date of increase and the amount of increase stated in total dollars and as a percentage of the former price from January 2004 forward.

## COUNTS

## COUNT I

### False Claims Act
### 31 U.S.C. §§3729(a)(1) and (a)(2)
(Against All Defendants)

    102.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

103.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

104.    By virtue of the acts described above, Defendants knowingly presented or caused to be presented, false or fraudulent claims to officers, employees or agents of the United States Government for payment or approval, within the meaning of 31 U.S.C. §3729(a)(1).

105.    By virtue of the acts described above, Defendants knowingly made, used, or caused to be made or used false or fraudulent records and statements, and omitted material facts, to get false or fraudulent claims paid or approved by the United States Government, within the meaning of 31 U.S.C. §3729(a)(2).

106.    The United States, unaware of the falsity of the records, statements and claims made or caused to be made by the defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

107.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

108.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every false and fraudulent claim made and caused to be made by defendants arising from their unlawful conduct as described herein.

## COUNT II

### False Claims Act
### 31 U.S.C. §§3729(a)(3)
(Against All Defendants)

109.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

110.    This is a claim for treble damages and penalties under the False Claims Act, 31 U.S.C. §3729, et seq., as amended.

111.    By virtue of the acts described above, defendants conspired with each other and with others unknown to defraud the United States by inducing the United States to pay or approve false and fraudulent claims, within the meaning of 31 U.S.C. §3729(a)(3). Defendants, moreover, took substantial steps in furtherance of the conspiracy, inter alia, by making false and fraudulent statements and representations, by preparing false and fraudulent records, and/or by failing to disclose material facts.

112.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

113.    Additionally, the United States is entitled to the maximum penalty of $11,000 for each and every violation of 31 U.S.C. §3729(a)(3) as described herein.

## COUNT III

### False Claims Act
### 31 U.S.C. §3729(a)(7)
(Against All Defendants)

114.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

115.    This is a claim for penalties and treble damages under the Federal False Claims Act.

116.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States Government, within the meaning of 31 U.S.C. §3729(a)(7).

117.    As a result, monies were lost to the United States through the non-payment or non-transmittal of money or property owed to the United States by the defendants, and other costs were sustained by the United States.

118.    By reason of the defendants' acts, the United States has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

119.    Additionally, the United States is entitled to the maximum penalty of up to $11,000 for each and every false record or statement knowingly made, used, or caused to be made or used to conceal, avoid, or decrease an obligation to pay or transmit money or property to the United States.

## COUNT IV

### Unjust Enrichment

120.    Relator repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

121.    By virtue of their conduct, Defendants have been unjustly enriched at the expense of the United States and the various states.  By obtaining moneys as a result of their violations of federal and state law, Defendants were unjustly enriched, and are liable to account and pay such amounts to be determined at trial.

122.    By this claim, Relator demands a full accounting of all revenues (and interest thereon) and costs incurred by Defendants on sales to customers based on the DSAs containing fee for service provisions and price appreciation clauses and disgorgement of all profits earned and/or imposition of a constructive trust in favor of the United States and the states.

## COUNT V

### Common Law Fraud

123.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

124.    Defendants made or caused to be made material and false representations concerning the pricing of their pharmaceutical products with knowledge of their falsity or with reckless disregard for the truth.  Defendants intended to and did cause the United States and the

various states to act upon those misrepresentations to their detriment. The United States acted in justifiable reliance upon Defendants' misrepresentations by making payments on the false claims.

125.    Had Defendants made truthful statements, the United States and the states would not have made payments in excess of monies due or, in the case of the United States, foregone rebates to which it was entitled.

126.    As a direct and proximate cause of Defendants' conduct, the United States and the various states have been damaged in an amount to be determined at trial.

## COUNT VI

### California False Claims Act
### Cal Govt Code §12651(a)(1)-(3)
(Against All Defendants)

127.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

128.    This is a claim for treble damages and penalties under the California False Claims Act.

129.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the California State Government for payment or approval.

130.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the California State Government to approve and pay such false and fraudulent claims.

131.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the California State Government.

32

132.    The California State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

133.    By reason of the defendants' acts, the State of California has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

134.    Additionally, the California State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT VII

### Delaware False Claims And Reporting Act
### 6 Del C. §1201(a)(1)-(3)

(Against All Defendants)

135.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

136.    This is a claim for treble damages and penalties under the Delaware False Claims And Reporting Act.

137.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Delaware State Government for payment or approval.

138.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Delaware State Government to approve and pay such false and fraudulent claims.

139.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Delaware State Government.

████████████████ ~~unaware of the~~ falsity of the records, statements ████████████████ by defendants, paid ████████████████ would not be paid but for defendants' unlawful conduct.

141.    By reason of the defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

142.    Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)
(Against All Defendants)

143.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144.    This is a claim for treble damages and penalties under the Florida False Claims Act.

145.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

146.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

147.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

34

140. The Delaware State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

141. By reason of the defendants' acts, the State of Delaware has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

142. Additionally, the Delaware State Government is entitled to the maximum penalty of $11,000 for each and every violation alleged herein.

## COUNT VIII

### Florida False Claims Act
### Fla. Stat. Ann. §68.082(2)
(Against All Defendants)

143. Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

144. This is a claim for treble damages and penalties under the Florida False Claims Act.

145. By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Florida State Government for payment or approval.

146. By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Florida State Government to approve and pay such false and fraudulent claims.

147. By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Florida State Government.

148.     The Florida State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

149.     By reason of the defendants' acts, the State of Florida has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

150.     Additionally, the Florida State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT IX

### Hawaii False Claims Act
### Haw. Rev. Stat. §661-21(a)
(Against All Defendants)

151.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

152.     This is a claim for treble damages and penalties under the Hawaii False Claims Act.

153.     By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Hawaii State Government for payment or approval.

154.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Hawaii State Government to approve and pay such false and fraudulent claims.

155.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Hawaii State Government.

156.   The Hawaii State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

157.   By reason of the defendants' acts, the State of Hawaii has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

158.   Additionally, the Hawaii State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT X

### Illinois Whistleblower Reward And Protection Act
### 740 Ill. Comp. Stat. §175/3(a)(1)-(3)
(Against All Defendants)

159.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

160.   This is a claim for treble damages and penalties under the Illinois Whistleblower Reward And Protection Act.

161.   By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Illinois State Government for payment or approval.

162.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Illinois State Government to approve and pay such false and fraudulent claims.

163.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Illinois State Government.

164.    The Illinois State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

165.    By reason of the defendants' acts, the State of Illinois has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

166.    Additionally, the Illinois State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XI

### Indiana False Claims and Whistleblower Protection Act
### IC 5-11-5.5-2(b)(1) and (2)
(Against All Defendants)

167.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

168.    This is a claim for treble damages and penalties under the Indiana False Claims and Whistleblower Protection Act.

169.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Indiana State Government for payment or approval.

170.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Indiana State Government to approve and pay such false and fraudulent claims.

171.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Indiana State Government.

172.    The Indiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

173.    By reason of the defendants' acts, the State of Indiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

174.    Additionally, the Indiana State Government is entitled to a penalty of at least $5,000 for each and every violation alleged herein.

## COUNT XII

### Louisiana Medical Assistance Programs Integrity Law
### La. Rev. Stat. § 437 et seq.
(Against All Defendants)

175.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

176.    This is a claim for treble damages and penalties under the Louisiana Medical Assistance Programs Integrity Law.

177.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Louisiana State Government for payment or approval.

178.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Louisiana State Government to approve and pay such false and fraudulent claims.

179.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Louisiana State Government.

180.    The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

181.    By reason of the defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182.    Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(3)
(Against All Defendants)

183.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184.    This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

185.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

186.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

187.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

188.    The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

180.     The Louisiana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

181.     By reason of the defendants' acts, the State of Louisiana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

182.     Additionally, the Louisiana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIII

### Massachusetts False Claims Law
### Mass. Gen. Laws ch. 12 §5B(1)-(3)
(Against All Defendants)

183.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

184.     This is a claim for treble damages and penalties under the Massachusetts False Claims Law.

185.     By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Massachusetts State Government for payment or approval.

186.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Massachusetts State Government to approve and pay such false and fraudulent claims.

187.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Massachusetts State Government.

188.     The Massachusetts State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by

39

defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

189.    By reason of the defendants' acts, the State of Massachusetts has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

190.    Additionally, the Massachusetts State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XIV

### Michigan Medicaid False Claims Act
### Mich. Public Act 337
(Against All Defendants)

191.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

192.    This is a claim for treble damages and penalties under the Michigan Medicaid False Claims Act.

193.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Michigan State Government for payment or approval.

194.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Michigan State Government to approve and pay such false and fraudulent claims.

195.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Michigan State Government.

196.    The Michigan State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

197.    By reason of the defendants' acts, the State of Michigan has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

198.    Additionally, the Michigan State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XV

### Montana False Claims Act
### Mont. Code Ann. 17-8-403 (1)(a) and (b)
(Against All Defendants)

199.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

200.    This is a claim for treble damages and penalties under the Montana False Claims Act.

201.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Montana State Government for payment or approval.

202.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or  used false records and statements, and omitted material facts, to induce the Montana State Government to approve and pay such false and fraudulent claims.

203.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Montana State Government.

204.    The Montana State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

205.    By reason of the defendants' acts, the State of Montana has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

41

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

206.   Additionally, the Montana State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XVI

**Nevada False Claims Act**
**Nev. Rev. Stat. Ann. §357.040(1)(a)-(c)**
(Against All Defendants)

207.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

208.   This is a claim for treble damages and penalties under the Nevada False Claims Act.

209.   By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Nevada State Government for payment or approval.

210.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Nevada State Government to approve and pay such false and fraudulent claims.

211.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Nevada State Government.

212.   The Nevada State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

213.   By reason of the defendants' acts, the State of Nevada has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

214.   Additionally, the Nevada State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

42

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

## COUNT XVII

### New Hampshire False Claims Act
### N.H. Rev. Stat. Ann. §167:61-b(I)(a)-(c)
(Against All Defendants)

215.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

216.    This is a claim for treble damages and penalties under the New Hampshire False Claims Act.

217.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Hampshire State Government for payment or approval.

218.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Hampshire State Government to approve and pay such false and fraudulent claims.

219.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Hampshire State Government.

220.    The New Hampshire State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

221.    By reason of the defendants' acts, the State of New Hampshire has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

222.    Additionally, the New Hampshire State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

43

## COUNT XVIII

### New Mexico Medicaid False Claims Act
### N.M. Stat. Ann. § 27-2F-4
(Against All Defendants)

223.   Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

224.   This is a claim for treble damages and penalties under the New Mexico Medicaid False Claims Act.

225.   By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the New Mexico State Government for payment or approval.

226.   By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the New Mexico State Government to approve and pay such false and fraudulent claims.

227.   By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the New Mexico State Government.

228.   The New Mexico State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

229.   By reason of the defendants' acts, the State of New Mexico has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

230.   Additionally, the New Mexico State Government is entitled to civil penalties for each and every violation alleged herein.

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

## COUNT XIX

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)
(Against All Defendants)

231.     Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

232.     This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

233.     By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

234.     By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

235.     By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

236.     The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

237.     By reason of the defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

238.     Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

45

## COUNT XIX

### Tennessee False Claims Act and Medicaid False Claims Act
### Tenn. Code Ann. §§ 4-18-103(a) and 71-5-182(a)(1)
(Against All Defendants)

231.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

232.    This is a claim for treble damages and penalties under the Tennessee Medicaid False Claims Law.

233.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Tennessee State Government for payment or approval.

234.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Tennessee State Government to approve and pay such false and fraudulent claims.

235.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Tennessee State Government.

236.    The Tennessee State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

237.    By reason of the defendants' acts, the State of Tennessee has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

238.    Additionally, the Tennessee State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

## COUNT XX

### Texas Medicaid Fraud Prevention Law
### Tex. Hum. Res. Code Ann. §36.002
(Against All Defendants)

239.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

240.    This is a claim for treble damages and penalties under the Texas Medicaid Fraud Prevention Law.

241.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Texas State Government for payment or approval.

242.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Texas State Government to approve and pay such false and fraudulent claims.

243.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Texas State Government.

244.    The Texas State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

245.    By reason of the defendants' acts, the State of Texas has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

246.    Additionally, the Texas State Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

46

FEDERAL FALSE CLAIMS ACT CASE
FILED UNDER SEAL

## COUNT XXI

### Virginia Fraud Against Taxpayers Act
### Va. Code Ann. §8.01-216.3(a)(1)-(3)
(Against All Defendants)

247.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

248.    This is a claim for treble damages and penalties under the Virginia Fraud Against Taxpayers Act.

249.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the Virginia State Government for payment or approval.

250.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the Virginia State Government to approve and pay such false and fraudulent claims.

251.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Virginia State Government.

252.    The Virginia State Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

253.    By reason of the defendants' acts, the State of Virginia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

254.    Additionally, the Virginia State Government is entitled to the maximum penalty $10,000 for each and every violation alleged herein.

47

## COUNT XXII

### District of Columbia Procurement Reform Amendment Act
### D.C. Code Ann. §2-308.14(a)(1)-(3)
(Against All Defendants)

255.    Plaintiff repeats and realleges each and every allegation contained in the paragraphs above as though fully set forth herein.

256.    This is a claim for treble damages and penalties under the District of Columbia Procurement Reform Amendment Act.

257.    By virtue of the acts described above, defendants knowingly presented or caused to be presented, false or fraudulent claims to the District of Columbia Government for payment or approval.

258.    By virtue of the acts described above, defendants knowingly made, used, or caused to be made or used false records and statements, and omitted material facts, to induce the District of Columbia Government to approve and pay such false and fraudulent claims.

259.    By virtue of the acts described above, defendant knowingly made, used, or caused to be made or used, false records or statements to conceal, avoid, or decrease an obligation to pay or transmit money or property to the District of Columbia Government.

260.    The District of Columbia Government, unaware of the falsity of the records, statements and claims made, used, presented or caused to be made, used or presented by defendants, paid and continues to pay the claims that would not be paid but for defendants' unlawful conduct.

261.    By reason of the defendants' acts, the District of Columbia has been damaged, and continues to be damaged, in substantial amount to be determined at trial.

262.    Additionally, the District of Columbia Government is entitled to the maximum penalty of $10,000 for each and every violation alleged herein.

48

   
## PRAYER FOR RELIEF

263.    WHEREFORE, Relator prays for judgment against the defendants as follows:

A.      that defendants cease and desist from violating 31 U.S.C. §3729 *et seq.*, and the counterpart provisions of the state statutes set forth above;

B.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the United States has sustained because of defendants' actions, plus a civil penalty of not less than $5,000 and not more than $11,000 for each violation of 31 U.S.C. §3729;

C.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of California has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Cal. Govt. Code §1651(a);

D.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Delaware has sustained because of defendants' actions, plus a civil penalty of $11,000 for each violation of 6 Del. C. §1201(a);

E.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Florida has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Fla. Stat. Ann. §68.082(2);

F.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Hawaii has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Haw. Rev. Stat. §661-21(a);

G.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Illinois has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of 740 Ill. Comp. Stat. §175/3(a);

H.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Indiana has sustained because of defendants' actions, plus a civil penalty of at least $5,000 for each violation of IC 5-11-55;

I.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Louisiana has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of La. Rev. Stat. §437 et. seq.;

J.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Massachusetts has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Mass. Gen. L. Ch. 12 §5B;

K.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Michigan has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of MI Public Act 337;

L.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Montana has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Mont. Stat. Ann. 17-8-401;

M.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Nevada has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Nev. Rev. Stat. Ann. §357.040(1);

N.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of New Hampshire has sustained because of defendants' actions, plus civil penalties for each violation of N.H. Rev. Stat. Ann. §167:61-b(I);

O.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of New Mexico has sustained because of defendants' actions, plus civil penalties for each violation of N.M. Stat. Ann. §27-2F-4;

P.      that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Tennessee has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Tenn. Code Ann. §§4-18-103(a) and 71-5-182(a)(1);

Q.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Texas has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Tex. Hum. Res. Code Ann. §36.002;

R.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the State of Virginia has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of Va. Code Ann. §8.01-216.3(a);

S.    that this Court enter judgment against defendants in an amount equal to three times the amount of damages the District of Columbia has sustained because of defendants' actions, plus a civil penalty of $10,000 for each violation of D.C. Code Ann. §2-308.14(a);

T.    that Relator be awarded the maximum amount allowed pursuant to §3730(d) of the False Claims Act, and the equivalent provisions of the state statutes set forth above;

U.    that Relator be awarded all costs of this action, including attorneys' fees and expenses; and

V.    that Relator recovers such other relief as the Court deems just and proper.

## JURY DEMAND

264.    Plaintiff Relator demands a trial by jury.

Dated: October 28, 2008                       Respectfully Submitted:

**FARUQI & FARUQI, LLP**

/s/ Jacob A. Goldberg JAG 3869
Kendall S. Zylstra
(Pa Bar No. 64006)
Jacob A. Goldberg
(Pa Bar No. 66399)
2600 Philmont Avenue, Suite 324
Huntingdon Valley, PA 19006
Tel: (215) 914-2460
Email:kzylstra@faruqilaw.com
jgoldberg@faruqilaw.com

*-and-*

51

Nadeem Faruqi
Richard Schwartz
369 Lexington Avenue, 10th Floor
New York, NY  10017
Tel: (212) 983-9330
Email:nfaruqi@faruqilaw.com
rschwartz@faruqilaw.com

*Attorneys for Relator Ronald J. Streck*

52

**CERTIFICATE OF SERVICE**

Pursuant to 31 U.S.C. §3730(b)(2) and Federal Rule of Civil Procedure 4(d)(4), on this 28th Day of October 2008, I caused a true and correct copy of this Complaint to be served upon Eric Gill, Assistant United States Attorney at the Office of the United States Attorney, Eastern District of Pennsylvania at 615 Chestnut Street, Suite 1250, Philadelphia, PA  19106.

/s/ Jacob A. Goldberg JAG3869